UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARNETT LIONEL ROMANS,

      Petitioner,

                                    CASE NO. 2:06-CV-11330
v.                                 HONORABLE PATRICK J. DUGGAN

MARY BERGHUIS,

      Respondent.
_____/

## OPINION AND ORDER DENYING THE
## PETITION FOR WRIT OF HABEAS CORPUS

At a session of said Court, held in the
U.S. District Courthouse, Eastern District
of Michigan on December 4, 2007.

PRESENT:  HONORABLE PATRICK J. DUGGAN
U.S. DISTRICT COURT JUDGE

Petitioner Arnett Lionel Romans ("Petitioner"), presently confined at the Carson City Correctional Facility in Carson City, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In his *pro se* application, Petitioner challenges his conviction for the following: (1) first-degree murder, in violation of MICH. COMP. LAWS ANN. § 750.316; (2) assault with intent to commit murder, in violation of MICH. COMP. LAWS ANN. § 750.83; (3) felon in possession of a firearm, in violation of MICH. COMP. LAWS ANN. § 750.224f; and, (4) possession of a firearm in the commission of a felony, in violation of MICH. COMP. LAWS ANN. § 750.227b.  For the reasons stated below, the Court denies the Petitioner's request for a writ of habeas corpus.

# I. Background

Following a jury trial in the Circuit Court for the County of Wayne, State of Michigan, Petitioner was convicted of shooting and killing Johnnie Davis and shooting and wounding Cheryl Alexander on October 30, 2001. Petitioner's first jury trial commenced on April 8, 2002. On April 15, 2002, the trial court declared a mistrial after one of the jurors indicated he could no longer sit on the jury due to a medical problem.

On June 21, 2002, the Friday before Petitioner's re-trial was to commence, the prosecution presented a letter from Ms. Alexander's doctor, Dr. Joe Talbert, that had been written two days prior to the court hearing. In this letter, Dr. Talbert indicated that Ms. Alexander had been admitted to Detroit Receiving Hospital on June 6, 2002 due to bleeding in her lung which had resulted from the shooting. He further indicated that Ms. Alexander underwent a thoracotomy on June 17, 2002 to remove a bullet that still was inside of her body, and that on June 19, 2002, doctors had placed Ms. Alexander in the surgical step-down unit to recover. Dr. Talbert wrote that Ms. Alexander had been given a spinal epidural to administer morphine for her pain. Dr. Talbert informed the court that Ms. Alexander would be hospitalized for at least one additional week and would be physically unable to come to court to testify for the period of time scheduled for Petitioner's trial.

Based on Ms. Alexander's condition, the prosecution moved to submit her testimony from Petitioner's first trial in lieu of her live testimony. Petitioner's counsel objected and asked the court to instead grant a continuance until Ms. Alexander was

available to personally testify. The trial court found that Dr. Talbert's letter showed that Ms. Alexander was suffering from very severe pain and that it did not appear that she would be available to testify for some time. The court further found that Ms. Alexander's medical condition would, at the very least, prevent her from participating in the scheduled trial. Although agreeing to check on Ms. Alexander's medical condition after the weekend to determine her availability to testify in person, the court indicated that, if she remained unavailable, it would allow the admission of her testimony from the first trial. The court therefore rejected Petitioner's request for a continuance.

On Monday, June 24, 2002, Ms. Alexander still was in the hospital. The trial court therefore found Ms. Alexander unavailable to testify at trial and allowed the prosecution to admit her transcribed testimony from the first trial in lieu of her live testimony. Petitioner's re- trial thereafter commenced and concluded five days later on June 28.

The testimony at trial established that on October 30, 2001, at approximately 1:50 p.m., Ms. Alexander was riding in a van with her friend, Jamal Reno, in the area of Modern and Goddard Streets in Detroit. As they were driving, they saw Johnnie Davis sitting inside a green car and Mr. Davis signaled for Ms. Alexander and Mr. Reno to pull over. Mr. Reno parked the van in front of Mr. Davis' car and both Mr. Reno and Ms. Alexander exited the van. Mr. Reno walked to the corner to talk to two women; Ms. Alexander got into the passenger seat of Mr. Davis' car.

A silver car subsequently pulled alongside Mr. Davis' car. Ms. Alexander testified that Petitioner, who she had known for twenty years as Lionel Harrison, was sitting in the

passenger seat of the car. Ms. Alexander testified that Petitioner then pulled out a handgun and fired numerous shots into Mr. Davis's car. The first gunshot broke through the driver's window and struck Mr. Davis in the head. Ms. Alexander was shot in the head by a subsequent bullet. Ms. Alexander turned from Petitioner and was shot three times in the back. She testified that the silver car then continued to the corner and turned around. When the car passed Mr. Davis' car a second time, Petitioner fired seven additional shots at Mr. Davis and Ms. Alexander. In total, Mr. Davis was shot at least eleven times. Ms. Alexander was shot once in the head and three times in her back.

At about 1:50 p.m., City of Detroit Police Officers James Kraszewski and James Kimbrough were called to the area of Modern and Goddard to respond to shots fired. The officers, who were a quarter to a half mile away from the area when they received the call, arrived at the scene within a few minutes. Ms. Alexander immediately identified Lionel Harrison as the shooter to the officers. Ms. Alexander testified that she knew Petitioner for twenty years before the shooting and that she was certain he was the shooter. She further testified that Petitioner was wearing a blue, hooded jogging suit.

The officers also spoke with Jamal Reno after they arrived at the scene. Mr. Reno told the officers that Petitioner was the shooter. Mr. Reno testified that he was certain of his identification, as he had known Petitioner for three years before the shooting occurred. Mr. Reno further testified that Petitioner, who was sitting in the passenger seat of the silver car, was holding a .9 millimeter handgun when the silver car pulled alongside Mr. Davis' car and that he then fired seven shots into Mr. Davis' car. Mr. Reno testified that

4

he saw Petitioner shoot six or seven more times at Ms. Alexander and Mr. Davis when the silver car made its second pass at Mr. Davis' car. According to Mr. Reno, he saw Petitioner at a gas station sitting in the same silver car about an hour before the shooting.

Shortly after the shooting, Petitioner was observed standing across the street from the crime scene, dressed in a dark hooded sweatshirt.

Mr. Davis' grandmother, Jacqueline Davis, testified that Petitioner came to her house about an hour after the shooting. She further testified that Petitioner was wearing a black or navy blue hood. According to Ms. Davis, Petitioner told her at the time that he knew he was going to be accused of the shooting and he said that he was at the hospital when the shooting occurred. Ms. Davis testified that Petitioner returned to her house sometime later that day, wearing lighter colored clothing. She further testified that Petitioner told her during this second visit to tell the police that he was at the hospital at the time of the shooting. Ms. Davis told Petitioner that she could not say that and that the police would find out that he was not at the hospital because of the hospital's surveillance cameras.

Ms. Davis testified that later in the afternoon on the day of the shooting, Sonya Lee, who is the mother of Petitioner's baby, arrived at Ms. Davis' house with Ms. Lee's brother and the baby. According to Ms. Davis, Petitioner was not with them. Ms. Lee and the baby slept at Ms. Davis' home that evening.

The day after the shooting, Petitioner returned to Ms. Davis' home. Rhonda Davis, Johnnie Davis' mother, was at the house at the time. Jacqueline Davis, Rhonda

5

Davis, and Petitioner went into the bathroom to pray for the shooting victims, at which time Rhonda Davis informed Petitioner that Ms. Alexander still was alive. According to Rhonda Davis, Petitioner then "broke out of the bathroom."

A staff member at Hutzel Hospital, Doris Banks, also testified at Petitioner's trial. According to Ms. Banks, a few days after the shooting, Petitioner came to Hutzel Hospital with Ms. Lee and the couple's baby. Ms. Banks testified that Petitioner asked her to call his lawyer and tell him that she saw Petitioner at the hospital at the time of the shooting. Ms. Banks refused, as she remembered seeing the baby and Ms. Lee at the hospital on the day of the shooting, but not Petitioner.

Several days following the shooting, after the police arrested Petitioner, Petitioner telephoned Jacqueline Davis' house and spoke with Ms. Davis and Niesha Smith, the mother of Johnnie Davis' son. According to Ms. Davis, Petitioner told her during this telephone conversation that she had to go to the police and make a statement saying that he was at the hospital at the time of the shooting. Ms. Smith testified that Petitioner asked her whether she made a statement to the police and told her that she had to change her statement.

At trial, Petitioner presented an alibi defense. Petitioner's defense was that he went to Oakland County at 1:00 p.m. on the day of the shooting to pick up Ms. Lee and the couple's baby in order to take Ms. Lee to a 1:45 p.m. doctor's appointment at Hutzel Hospital. Petitioner testified that he arrived at Hutzel Hospital at approximately 1:46 p.m. and that he accompanied Ms. Lee and the baby into the hospital. Petitioner claimed that

6

he stood next to Ms. Lee as she registered for her appointment, the baby started crying, and he tried to soothe the baby. According to Petitioner, he received a phone call while he was waiting with Ms. Lee, informing him that Johnnie Davis had been killed. Petitioner testified that he then left the hospital to find Mr. Davis' father and grandmother. Petitioner testified that he returned to the hospital between 5:45 and 6:45 p.m. to pick up Ms. Lee and the baby and that he then drove back to Oakland County where they spent the night at a friend's house.

Petitioner introduced a surveillance videotape from Hutzel Hospital in an attempt to corroborate his alibi. According to the videotape, someone resembling Petitioner entered the hospital at 2:45 p.m. and left at 3:17 p.m. This was approximately one hour after the shooting. Petitioner's counsel tried to explain the time discrepancy as the result of Daylights Saving Time, which took place on October 28, suggesting that the clock on the video had not been changed to reflect the time change. It was defense counsel's theory that the videotape clock was one hour ahead of the actual time. In order to buttress this theory, defense counsel pointed out that in one of the images from the hospital's surveillance photos, a wall clock reflects the time of 1:45 p.m.

Pamela Shepley from Hutzel Hospital testified that she remembered seeing Ms. Lee in the OB-GYN clinic at around 2:00 p.m. on October 30, but she did not remember seeing Petitioner.

Petitioner's trial concluded on June 28, 2002. On that date, the jury returned a verdict finding Petitioner guilty as charged. The trial court sentenced Petitioner on July

7

15, 2002. The Michigan Court of Appeals subsequently affirmed Petitioner's conviction. *People v. Romans*, No. 245088 (Mich. Ct. App. April 20, 2004). On December 29, 2004, the Michigan Supreme Court denied Petitioner leave to appeal. *People v. Romans*, 471 Mich. 947, 690 N.W. 2d 114 (2004).

On March 30, 2006, Petitioner filed the pending application for a writ of habeas corpus. Petitioner raises the following grounds in support of his petition:

> I.    The trial court reversibly erred in granting the prosecutor's request, days before trial, to declare crucial prosecution witness Cheryl Alexander unavailable and to permit her prior recorded testimony to be read to the jury over counsel's objection and request for adjournment because the witness was only briefly unavailable and the denial of Petitioner's motion to adjourn interfered with Petitioner's rights to confrontation and to present his defense and violated his rights to effective assistance of counsel and to a fair trial.
>
> II.    The trial court abused its discretion when it denied Petitioner's motion for directed verdict of acquittal after conviction because the verdict was against the great weight of the evidence.
>
> III.    There was insufficient evidence to establish beyond a reasonable doubt either that it was Petitioner who caused the death of complainant Davis or that he committed the assault upon complainant Alexander.
>
> IV.    The trial court violated Petitioner's due process right to present a defense by excluding the testimony of witness Stony Harris that a person named Miguel had admitted to Harris that he intended to kill Petitioner but that he shot the complainants by mistaking complainant Davis for Petitioner.

## II. Standard of Review

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pursuant to the AEDPA, Petitioner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Simply stated, under Section 2254(d), Petitioner must show that the state court's decision "was either contrary to, or an unreasonable application of, [the Supreme] Court's clearly established precedents, or was based upon an unreasonable determination of the facts." *Price v. Vincent*, 538 U.S. 634, 639, 123 S.Ct. 1848, 1852-53 (2003).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 1523 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

## III. Analysis

### A.

Petitioner first claims that his constitutional rights were violated when the trial court permitted the prosecutor to introduce Cheryl Alexander's transcribed testimony from Petitioner's first trial, on the ground that she was unavailable due to health problems to testify at his re-trial. Petitioner asserts that the introduction of Ms. Alexander's transcribed testimony from his first trial violated his rights under the Sixth Amendment Confrontation Clause. The first task in analyzing Petitioner's Confrontation Clause claim is to determine what constitutes "clearly established federal law" with respect to that claim.

The phrase "clearly established federal law," for purposes of Section 2254(d)(1), "is the governing legal principle or principles set forth by the Supreme Court *at the time the state court renders its decision.*" *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 1172 (2003) (emphasis added). At the time of Petitioner's trial, United States Supreme Court precedent established that the hearsay statements of a declarant who is not present for cross-examination at trial are admissible only if (1) the declarant is unavailable and (2) the evidence falls within a firmly rooted exception to the hearsay rule or contains particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything, to the statement's reliability. *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 2539 (1980). On March 8, 2004, in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004), the Supreme Court overruled its

holding in *Ohio v. Roberts*.  In *Crawford*, the Court held that out-of-court statements that are testimonial in nature are not admissible under the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether the statements fall within a hearsay exception or are otherwise trustworthy.  *Id*. at 59, 124 S. Ct. at 1369.

The Michigan Court of Appeals decided Petitioner's direct appeal on April 20, 2004, after the United States Supreme Court issued its decision in *Crawford*.  The Michigan Supreme Court denied Petitioner's application for leave to appeal on December 29, 2004.  The Sixth Circuit instructs that "[u]nder [the] AEDPA ... [a court's] inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyskiewicz*, 255 F. 3d 313, 317-18 (6th Cir. 2001). Therefore, *Crawford* constitutes the clearly established federal law as determined by the Supreme Court for purposes of analyzing Petitioner's confrontation claim.

Petitioner first asserts that the trial court erred in declaring Ms. Alexander unavailable to testify at his re-trial, arguing that the prosecution failed to show that Ms. Alexander could not have testified in person at a later date.  The Michigan Court of Appeals rejected this argument, noting that under the plain language of Michigan Rule of Evidence 804(a)(4), a witness may be declared unavailable to testify because of a "*then existing* physical infirmity."  *Romans*, No 245088, slip op. at *2 (emphasis added by Michigan court).  Because the prosecution established that Ms. Alexander was suffering

from a physical infirmity at the time of trial and that she would not be available to testify

until the trial concluded, the trial court did not err in finding her unavailable.

When a party claims that a witness is unavailable for health reasons, "there must

be 'the requisite finding of necessity' which is 'case specific' in order to dispense with

confrontation in open court." *Stoner v. Sowders*, 997 F. 2d 209, 212 (6th Cir. 1993)

(quoting *Maryland v. Craig*, 497 U.S. 836, 855, 110 S. Ct. 3157, 3169 (1990)). As the

Sixth Circuit has explained the relevant inquiry:

> When the government is claiming witness unavailability due
> to illness, the specific inquiry must focus on both the severity
> and duration of the illness. The court must inquire as to the
> specific symptoms of the illness to determine what tasks the
> patient is able to perform, and the court must determine
> whether there is the probability that the illness will last long
> enough "so that, with proper regard to the importance of the
> testimony, the trial cannot be postponed."

*Id.* at 212-13 (*quoting Burns v. Clusen*, 798 F. 2d 931, 937-38 (7th Cir. 1986)).

In the present case, the trial court engaged in a sufficient inquiry into the nature of

Ms. Alexander's health problems to determine that she would be unable to appear for

Petitioner's trial. Petitioner's second trial was to begin on June 24, 2002. In a letter

written five days earlier, Ms. Alexander's doctor indicated that Ms. Alexander had been

admitted to the hospital on June 6, 2002 due to bleeding in her lung and that she

underwent a thoracotomy on June 17, 2002 to remove a bullet that still was inside of her.

On June 19, 2002, Ms. Alexander was placed in a surgical step-down unit to recover and

given a spinal epidural to administer morphine for her pain. Ms. Alexander's doctor

indicated that she would be hospitalized for at least one additional week and would be physically unable to come to court to testify for the scheduled period of the trial.

On the day the trial was scheduled to begin, June 24, 2002, Ms. Alexander still was hospitalized and was being treated for a partially collapsed lung. Dr. Talbert estimated that Ms. Alexander would not be able to appear in court to testify until at least July 8, 2002, two weeks after the trial was scheduled to begin. Based on this information, the trial court did not err in finding Ms. Alexander unavailable to testify. *See United States v. Bruce*, Nos. 96-6590, 96-6591, 1998 WL 165144, at * 5-6 (6th Cir. March 31, 1998) (unpublished opinion) (holding that the district court did not err in admitting a witness' videotaped deposition at the defendant's criminal trial, where the witness had undergone abdominal surgery eleven days prior to trial and the witness' doctor indicated in a note that the witness would not be able to tolerate the ride to court due to post-surgical discomfort); *see also Ecker v. Scott*, 69 F. 3d 69, 73 (5th Cir. 1995)(holding that robbery victim suffering from bone cancer and hip fracture was "unavailable" to testify at Petitioner's second trial and therefore admitting the victim's prior testimony did not violate the Petitioner's rights under the Confrontation Clause, even though the Petitioner claimed that the victim might have been able to testify in four weeks).

The Michigan Court of Appeals did not mention *Crawford* in evaluating whether the admission of Ms. Alexander's prior testimony violated Petitioner's rights under the Confrontation Clause. Instead, the Michigan Court of Appeals concluded that Petitioner's constitutional rights were not violated as a result of the admission of Ms.

Alexander's prior testimony because the admission was premised on a "firmly rooted exception to the hearsay rule." *Romans*, No. 245088, slip op. at *3. Although the Michigan Court of Appeals erred in continuing to rely on the requirements set forth in *Ohio v. Roberts* for admitting testimonial hearsay statements of an unavailable witness, the requirements of *Crawford* were satisfied. As the Michigan Court of Appeals found, Petitioner's counsel had a strong motive and a full opportunity to cross-examine Ms. Alexander at Petitioner's first trial. Therefore, the admission of Ms. Alexander's transcribed testimony during petitioner's second trial did not violate Petitioner's Confrontation Clause rights. *Crawford*, 541 U.S. at 57, 124 S. Ct at 1367 (citing *Mattox v. United States*, 156 U.S. 237, 244, 15 S. Ct. 337 (1895) (allowing witness' prior trial testimony to be admitted at the defendant's second trial because the witness was unavailable and the defendant already had the opportunity to "see[] the witness face to face" and to "subject[] him to the ordeal of cross-examination.")

Petitioner further contends that the trial court erred in failing to grant his motion for a continuance in order to secure Ms. Alexander's live testimony at his re-trial. In criminal proceedings, a trial court's "denial of a continuance rises to the level of a constitutional violation only when there is 'an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay.'" *Burton v. Renico*, 391 F. 3d 764, 772 (6th Cir. 2004) (quoting *Morris v. Slappy*, 461 U.S. 1, 11-12, 103 S. Ct. 1610 (1983) (internal citations and quotation marks omitted). In order to obtain habeas relief, a habeas petitioner also must show that the denial of his request for a continuance resulted

in actual prejudice to his defense. *Id.* In the present case, in light of the fact that defense counsel was able to extensively cross-examine Ms. Alexander at the first trial, this Court cannot find that the trial court's denial of a continuance in order to secure her live testimony was objectively unreasonable or that it resulted in actual prejudice to Petitioner's defense. *Brown v. O'Dea*, 227 F. 3d 642, 645-46 (6th Cir. 2000).

Any error in the trial court's refusal to adjourn Petitioner's trial until Ms. Alexander could appear in person to testify was harmless at best. A federal court can grant habeas relief only if the trial error had a "substantial and injurious effect" upon the jury's verdict, regardless of whether the state court has conducted an harmless error analysis. *Fry v. Pliler,* – U.S. – , 127 S. Ct. 2321, 2328 (2007) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 113 S Ct. 1710 (1993)). In the present case, there was overwhelming evidence in addition to Ms. Alexander's testimony from which a rational jury could find Petitioner guilty of the charged crimes.

Mr. Reno, who had known Petitioner for three years before the shooting, identified Petitioner as the perpetrator. Mr. Reno further testified that he saw Petitioner at a gas station about an hour before the shooting, sitting in the same car that was used during the shooting. Mr. Reno immediately told the police that Petitioner was the shooter. Moreover, there was significant evidence that Petitioner attempted to manufacture an alibi defense shortly after the shooting. An attempt to procure perjured testimony to manufacture a false alibi defense can be considered as evidence of guilt as to the crime charged under both Michigan and federal law. *People v. Ranes*, 58 Mich. App.

268, 272, 227 N.W. 2d 312, 314 (1975); *Newman v. Metrish*, 492 F. Supp. 2d 721, 731

(E.D. Mich. 2007). The Court therefore cannot find a substantial and injurious effect

upon the jury's verdict so as to entitle Petitioner to relief as a result of the trial court's

refusal to adjourn the trial to secure Ms. Alexander's attendance.

**B.**

The Court will address Petitioner's second and third claims together, as the claims

are related. In his second claim, Petitioner contends that the jury's verdict was against the

great weight of the evidence. In his third claim, Petitioner challenges the sufficiency of

the evidence to convict him.

"A federal habeas court . . . has no power to grant habeas relief on a claim that a

state conviction is against the great weight of the evidence." *Cukaj v. Warren*, 305 F.

Supp. 2d 789, 796 (E.D. Mich. 2004); *Dell v. Straub*, 194 F. Supp. 2d 629, 648 (E.D.

Mich. 2002). "Such a claim is not of constitutional dimension for habeas corpus purposes

unless the record is so devoid of evidentiary support that a due process issue is raised."

*Cukaj*, 305 F. Supp. 2d at 796; *See also Blockson v. Jago*, 587 F.2d 10, 11 (6th Cir. 1978)

(citing *Brooks v. Rose*, 520 F.2d 775 (6th Cir. 1975)). The test for habeas relief is not

whether the verdict was against the great weight of the evidence, but whether there was

any evidence to support it. *Dell*, 194 F. Supp. 2d at 648. Therefore, as long as there was

sufficient evidence to convict Petitioner, the fact that the verdict may have gone against

the great weight of the evidence would not entitle him to habeas relief. *Id*.

"A habeas court reviews claims that the evidence at trial was insufficient for a

16

conviction by asking 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Scott v. Mitchell*, 209 F. 3d 854, 885 (6th Cir. 2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979)). "Th[is] standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n. 16, 99 S. Ct. at 2792 n. 16. When making this evaluation, a habeas court does not reweigh the evidence or redetermine the credibility of the witnesses. *Matthews v. Abramajtys*, 319 F. 3d 780, 788-89 (6th Cir. 2003). "It is the province of the fact-finder to weigh the probative value of the evidence and resolve any conflicts in testimony" *Id*. Therefore, "[t]he mere existence of sufficient evidence to convict defeats a petitioner's claim." *Id*.

To demonstrate a defendant's guilt of first-degree murder in Michigan, the prosecution must establish that the defendant intentionally killed the victim and that the act of killing was deliberate and premeditated. *Scott v. Elo*, 302 F. 3d 598, 602 (6th Cir. 2002) (citing *People v. Schollaert*, 194 Mich. App. 158, 486 N.W.2d 312, 318 (1992)). Under Michigan law, the elements of assault with intent to commit murder are "'(1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder.'" *Warren v. Smith*, 161 F. 3d 358, 361 (6th Cir. 1998) (quoting *People v. Plummer*, 229 Mich. App. 293, 581 N.W.2d 753, 759 (1998)). The second element, "[t]he specific intent to kill 'may be proven by inference from any facts in evidence.'" *Id*. (quoting *People v. Hoffman*, 225 Mich. App. 103, 570 N.W.2d 146, 150 (1997)). In

determining intent, the court may consider the following:

> "[T]he nature of the defendant's acts constituting the assault; the temper or disposition of mind with which they were apparently performed, whether the instrument and means used were naturally adapted to produce death, his conduct and declarations prior to, at the time, and after the assault, and all other circumstances calculated to throw light upon the intention with which the assault was made."

*Id.* (quoting *People v. Taylor*, 422 Mich. 554, 375 N.W.2d 1, 8 (1985)).

The elements of felon in possession of a firearm in Michigan are as follows: "(1) the defendant was convicted of a felony; (2) the defendant possessed a firearm; and (3) at the time of possession, less than three or five years, depending on the underlying felony, has passed since the defendant had completed his term of incarceration, satisfied all conditions of probation and parole, and paid all fines." *Parker v. Renico*, 450 F. Supp. 2d 727, 732 (E.D. Mich. 2006). Under Michigan law, the elements of felony-firearm are that the defendant possessed a firearm during the commission of, or an attempt to commit, a felony. *Payne v. Smith*, 207 F. Supp. 2d 627, 642 (E.D. Mich. 2002).

In the present case, there was sufficient evidence to convict Petitioner of the above crimes. Petitioner fired multiple gunshots at Mr. Davis and Ms. Alexander, striking Mr. Davis thirteen times and Ms. Alexander four times. Most of the victims' wounds were to the upper body and in fact both victims were struck in the head. Petitioner fired a number of shots, drove away, and then returned to fire seven or eight additional shots at the victims. This evidence alone was sufficient to establish that the killing of Johnnie Davis was premeditated and deliberate, so as to support the first-degree murder conviction.

This evidence also was sufficient to establish that Petitioner intended to kill Cheryl Alexander, in order to sustain the assault with intent to murder conviction. The parties stipulated that Petitioner previously was convicted of a felony and had not, at the time of the shooting, complied with the requirements under Michigan law to reinstate his right to possess a firearm. The evidence therefore supported Petitioner's conviction for felon in possession of a firearm. Finally, there was ample evidence that Petitioner used a firearm to commit these felonies to support the felony-firearm conviction.

Petitioner also contends that there was insufficient evidence to establish that he was the perpetrator in this case. Two witnesses, however, identified Petitioner as the shooter. Mr. Reno and Ms. Alexander identified Petitioner to the police immediately after the shooting and both knew Petitioner for several years before the incident. Based upon the testimony of either eyewitness, a rational jury could conclude beyond a reasonable doubt that Petitioner committed these offenses. *See Cameron v. Birkett*, 348 F. Supp. 2d 825, 839-840 (E.D. Mich. 2004). The reliability of the witnesses' identifications was for the jury to resolve. *Id.* "'The assessment of the credibility of witnesses is generally beyond the scope of [federal habeas] review.'" *Gall v. Parker*, 231 F.3d 265, 286 (6th Cir. 2000) (quoting *Schlup v. Delo*, 513 U.S. 298, 330, 115 S. Ct. 851 (1995)).

Petitioner's alibi defense did not render the evidence insufficient to support his convictions. While Petitioner claimed that he was at Hutzel Hospital at the time of the shooting, evidence was introduced to raise doubt as to whether his stay at the hospital in

fact overlapped the shooting. First, there was a question of the exact times when Petitioner was at the hospital. Moreover, there was testimony suggesting that Petitioner could have traveled from the hospital to the crime scene in a brief amount of time and that he was not present at the hospital during Ms. Lee's entire appointment. Petitioner also testified that he picked up Ms. Lee and the baby from the hospital and drove them to Oakland County, where they spent the night. Several witnesses testified, however, that Ms. Lee and the baby went from the hospital to Ms. Davis' home without Petitioner and that they spent the night at Ms. Davis' home. The jury apparently chose to reject Petitioner's alibi defense. Again, it was for the jury to weigh the evidence and assess the credibility of the witnesses and it is beyond the province of the habeas court to substitute its judgment for the jury. *See United States v. Pierce*, 62 F.3d 818, 826 (6th Cir. 1995).

The trial record supports the Michigan Court of Appeals' conclusion that the evidence was sufficient to sustain Petitioner's convictions. The Michigan Court of Appeals' rejection of Petitioner's sufficiency of the evidence claim therefore was not an unreasonable application of clearly established federal law. Consequently, Petitioner has no right to habeas relief on the basis of his second or third claims.

## C.

Petitioner finally contends that his right to present a defense was violated when the trial court excluded testimony from Petitioner's fellow inmate, Stoney Harris, that another person, Miguel Kimber, confessed to shooting Mr. Davis and Ms. Alexander. Petitioner sought to have Mr. Harris testify regarding Mr. Kimber's alleged confession because Mr.

Kimber had been murdered on November 17, 2001, about two weeks after the shooting of Mr. Davis and Ms. Alexander. Mr. Harris in fact had been charged with Mr. Kimber's murder and was awaiting trial at the time of Petitioner's re-trial.

On the third day of trial, Petitioner's counsel informed the court that Petitioner had received an unsigned and undated letter from Mr. Harris. Counsel further informed the court that Mr. Harris indicated in this letter that he had been told by Mr. Kimber that Mr. Kimber attempted to shoot Petitioner on Goddard and Modern streets in Detroit, but that he shot the victims by mistake. Petitioner's counsel argued that Mr. Harris should be allowed to testify about Mr. Kimber's admission because Mr. Kimber was unavailable and the statement was admissible under Michigan Rule of Evidence 804(b)(3) as a statement against Mr. Kimber's penal interest. The trial court rejected Mr. Harris' proposed testimony, finding that the testimony was untrustworthy for a number of reasons.

First, the trial court noted that Mr. Kimber's purported confession that he was attempting to shoot at Petitioner was inconsistent with Petitioner's alibi defense, as a reasonable interpretation of Mr. Kimber's purported confession would place Petitioner at the crime scene. In addition, because Mr. Harris was currently charged with Mr. Kimber's murder, the court was concerned about Mr. Harris' right against self-incrimination if he were called to testify. The court therefore rejected Petitioner's request to add Mr. Harris as a witness.

Just as an accused has the right to confront the prosecution's witnesses for the

purpose of challenging their testimony, he also has the right to present his own witnesses to establish a defense. This right is a fundamental element of the due process of law. *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 1923 (1967); *see also Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 2146 (1986) ("whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'") (internal citations omitted). However, "'[t]he accused does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.'" *Montana v. Egelhoff*, 518 U.S. 37, 42, 116 S. Ct. 2013, 2017 (1996) (quoting *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S. Ct. 646, 653 (1988)). The Supreme Court has indicated that the Constitution grants trial court judges "'wide latitude' to exclude evidence that is repetitive, marginally relevant or poses an undue risk of 'harassment, prejudice, or confusion of the issues.'" *Id.* (*quoting Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435 (1986)). Moreover, under the standard of review for habeas cases as enunciated in Section 2254(d)(1), it is not enough for a habeas Petitioner to show that the state trial court's decision to exclude potentially helpful evidence to the defense was erroneous or incorrect. Instead, a habeas petitioner must show that the state trial court's decision to exclude the evidence was "an objectively unreasonable application of clearly established Supreme Court precedent." *See Rockwell v. Yukins*, 341 F. 3d 507, 511-12 (6th Cir. 2003).

In *Chambers v. Mississippi*, 410 U.S. 284, 300, 93 S. Ct. 1038, 1048 (1973), the Supreme Court held that due process was violated where the state trial court excluded on hearsay grounds a third party's confession to the crime of which the defendant was charged, where the circumstances revealed the confession to be reliable. The Supreme Court found that the following circumstances provided assurance of the hearsay statement's reliability:

> 1. Each statement was made spontaneously to a close associate shortly after the murder was committed;
>
> 2. Each statement was corroborated by some other evidence in the case, such as the declarant's sworn confession, eyewitness testimony, or evidence linking the declarant to the murder weapon;
>
> 3. Each statement was against the declarant's interests; and
>
> 4. The declarant was available to be cross-examined about the out-of-court statements.

*Chambers*, 410 U.S. at 300-301, 93 S. Ct. at 1048-49. Additionally, under Michigan and federal law certain requirements must be satisfied before a statement against the interest of a witness unavailable to testify at trial may be admitted: (1) the declarant must be "unavailable" to testify, (2) the statement must subject the declarant to criminal liability in a real and tangible way, and (3) corroborating circumstances must clearly indicate the trustworthiness of the statement. *United States v. Price*, 134 F. 3d 340, 347 (6th Cir. 1998); *United States v. Hilliard*, 11 F. 3d 618, 619 (6th Cir. 1993); M.R.E. 804(b)(3).

"[T]he trial court does not need to be completely convinced as a prerequisite to

admission that the exculpatory statements are true. Rather, the trial court need only find that sufficient corroborating circumstances exist which indicate the statement's trustworthiness." *Price*, 134 F. 3d at 348. The requirement of corroboration is "not unrealistically severe," however, it goes "beyond minimal corroboration." *United States v. Mackey*, 117 F. 3d 24, 29 (1st Cir. 1997). Moreover, statements that are of "dubious exculpatory value" and bear "considerable indicia of *unreliability*" can be excluded from evidence. *Turpin v. Kassulke*, 26 F. 3d 1392, 1397 (6th Cir. 1994) (emphasis in original).

Petitioner fails to show that the trial court unreasonably applied clearly established law in making the determination that Mr. Kimber's purported confession was not sufficiently trustworthy to be admitted under the hearsay exception for statements against the declarant's penal interest. First, the purported letter from Mr. Harris to Petitioner was unsigned and undated. Second, there was no indication why Mr. Harris only wrote the letter just prior to the third day of Petitioner's second trial and not earlier. Third, there was no evidence that Mr. Kimber made his purported confession voluntarily to Mr. Harris, that it was made contemporaneously with the shooting, that Mr. Kimber would likely speak the truth to Mr. Harris, or that Mr. Kimber uttered this confession spontaneously without prompting from Mr. Harris. Although Petitioner claims that Mr. Harris' information was substantiated by transcripts from Mr. Harris' preliminary examination, there is no indication that either the trial court or the Michigan Court of Appeals was ever presented with that transcript. Additionally, there was no evidence of any kind to corroborate Mr. Kimber's purported confession. *See Chambers.*

Petitioner therefore is not entitled to habeas relief on his final claim.

## IV. Conclusion

For the reasons stated above, the Court concludes that Petitioner is not entitled to federal habeas relief on the claims presented in his petition.

Accordingly,

**IT IS ORDERED**, that the petition for writ of habeas corpus is **DENIED**.


                     s/PATRICK J. DUGGAN
                     UNITED STATES DISTRICT COURT JUDGE

Copies to:
Arnett Lionel Romans, #160711
Carson City Correctional Facility
10522 Boyer Road
Carson City, MI 48811

Brad H. Beaver, Esq.